## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JUSTIN MOORE** | * | **CIVIL ACTION** |
| | | **NO. 2:19-cv-01592** |
| **Plaintiff** | * | |
| | | |
| **VERSUS** | * | **JUDGE** |
| | | **BARRY W. ASHE** |
| **CENTRALIZED MANAGEMENT** | * | |
| **SERVICES, LLC and EPISODE** | | **MAGISTRATE JUDGE** |
| **SOLUTIONS, LLC** | * | **DANA DOUGLAS** |
| | | |
| **Defendant** | * | |

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

Defendants, Centralized Management Services, LLC ("CMS") and Episode Solutions, LLC ("Episode") (collectively, "Defendants") submit this memorandum in support of the reasons this Honorable Court should grant summary judgment in their favor on Plaintiff, Justin Moore's disability discrimination claims under the Americans with Disabilities Act, 42 U.S.C. § 12112.

### INTRODUCTION

Plaintiff Justin Moore is a former employee of CMS, a wholly-owed affiliate of Episode. Episode develops and manages value-based payment structures for musculoskeletal ("MSK") care in partnership with surgeons and hospitals. In August 2017, CMS hired Moore as a Regional Business Development Manager, serving Episode's New Orleans market. His performance in that capacity was lacking, as he failed to put forth any genuine effort to accelerate Episode's physician development, glossing over the urgency of volume in the New Orleans area. Compounding the gravity of these difficulties was the fact that they arose almost as soon as Moore's employment began and did not abate in the few weeks he worked for Defendants. Because of these deficiencies

and the high pace of business development Episode needed in the New Orleans market, Defendants decided to terminate Moore's employment.

Moore has now brought employment discrimination claims under the Americans with Disabilities Act of 1990 in which he alleges Defendants discriminated against him because of his status as a recovering alcoholic. In particular, Moore alleges that Defendants discriminated against him by: (1) terminating his employment after he disclosed that he is a recovering alcoholic and had suffered a relapse; and (2) failing to hold his job open for him while he sought treatment at an out-of-state in-patient rehabilitation program. Moore's discrimination claims against Defendants fail for several reasons, not the least of them being that he cannot prove that his status as a recovering alcoholic amounted to a disability under the ADA at the time Defendants terminated his employment with CMS. In addition, the primary decision-maker responsible for recommending termination of Moore's employment had legitimate reasons for her decision and was unaware Moore was a recovering alcoholic and had relapsed until after preparations were being made to end the employment relationship. Thus, Defendants could not have discriminated against Moore because of his alleged disability because the key decision-maker had no knowledge of his alcoholism.

Moore's failure-to-accommodate claim fails for similar reasons. Despite a continuous string of emails from his supervisor and his supervisor's supervisor conveying mounting dissatisfaction with Moore's business development efforts, waited until his employment termination was inevitable to notify Defendants of his need to undergo treatment for alcoholism. Moore's belated accommodation request was unreasonable and his effort to use the ADA as a shield against Defendants' legitimate employment decision is directly contrary to the purposes of the ADA.

Because Moore has failed to prove fundamental elements of his disparate treatment and failure-to-accommodate claims under the ADA, summary judgment in Defendants' favor is proper and Moore's claims against them should be dismissed.

## I.     UNDISPUTED FACTS

### A.     The Nature of Episode's Business and Role of the Regional Business Development Manager Position for the New Orleans market.

CMS hired Moore as the Regional Business Development Manager for the New Orleans market in August of 2017.[1] While CMS was Moore's actual employer, he performed services for Episode, CMS' parent company.[2] Episode provides resources and services, tailored exclusively to the needs of musculoskeletal ("MSK") physicians and physicians groups, to help evaluate and maximize physician performance in alternative payment structures, without sacrificing existing professional fee-for-service revenue.[3] The company does this by organizing selected MSK physicians into high-performing networks, deploying common patient care pathways in each of Episode's markets that utilize only the clinical care the patient actually requires. Episode's value-based platform enables MSK physicians to take advantage of the substantial opportunities to create and share in immediate savings through bundled payments. Having experienced strong demand from participating hospitals since its inception in June 2015, Episode's primary focus in 2017 was leveraging participants in the Centers for Medicare and Medicaid's Bundled Payment Care Initiative program and Comprehensive Joint Replacement program to use Episode's Internal Cost Savings (ICS) program for MSK bundles.[4] The aim of deploying its ICS program was to facilitate

---

[1] August 2, 2017 Offer Letter from CMS to Moore, signed by Moore on August 10, 2017, attached hereto as Exhibit A. *See also*, transcript of Moore's deposition taken December 3, 2019 ("Moore Dep."), at 81:14-23. A copy of cited excerpts from Moore's deposition are attached hereto *in globo* as Exhibit B.
[2] CMS is a wholly-owned affiliate of Episode. For purposes of this motion, Defendants presume that Moore will be able to establish that CMS and Episode are a single business enterprise. Episode reserves its right to assert available defenses to Moore's assertion of its joint liability at a later time in this matter, including but not limited to at trial.
[3] Declaration of Hutton Eadie dated January 1, 2020 ("Eadie Declaration"), ¶ 4 attached hereto as Exhibit C.
[4] *Id.* at ¶ 5.

3

development of physician networks in each of Episode's markets such that it would position the company to launch a second growth phase by securing value-based contracts with non-Medicare payers.[5]

New Orleans was one of Episode's newer target markets in 2017 and as a result, the company only had one lead sales representative position designated to that region.[6] CMS hired Moore in August 2017 to fill that role. Moore's job title – Regional Business Development Manager – was deceivingly generic. Indeed, the materials that the Human Capital Group, Inc. used to recruit prospective candidates, including Moore, for openings in Episode's California, Texas, and Louisiana markets in 2017 outline a far more dynamic position align with Episode's growth-oriented market strategy:

> [Episode] is seeking a dynamic individual to serve as their [Regional Business Development Manager]. He/She will serve as a **key client-facing leader, strategist and cultivator of new business development**. . . . The [Regional Business Development Manager] will be responsible for **contracting and growing networks of MSK physicians** to support the business operations of the Company. The Position will serve as a **key driver** in participating in the **strategic growth and execution** of the business plan. . . . The [Regional Business Development Manager] will manage and foster **deep, consultative and solutions-oriented relationships** by developing and showcasing pro-active and well thought out solutions that support [Episode's] promise of delivering exceptional device and bundled payment solutions & services.[7]

### B.    Moore's Employment with CMS.

The essential function of Moore's position at CMS was to help develop Episode's value-based healthcare payment programs by recruiting and fostering relationships with physicians and hospitals in the New Orleans market.[8] Although Moore's job afforded him some autonomy, he

---

[5] *Id.* at ¶ 6.

[6] *Id.* at ¶ 7.

[7] The Human Capital Group, Inc.'s Position Specification for Director of Development (a/k/a Regional Business Development Manager) position with Episode ("Position Spec Sheet") (emphasis in original). A true and correct copy of the Position Spec Sheet is attached hereto as Exhibit D. *See also*, Exhibit C, Eadie Declaration, at ¶ 8 authenticating Exhibit D.

[8] Exhibit B, Moore Dep. at 98:6-12.

4

was still expected to report to and collaborate with the Vice President of Business Development for his region, Angela Jones, in developing and sustaining an active pipeline of surgeons and hospitals.[9] To that end, during Moore's first week with CMS, Jones introduced him to her active client accounts in the area.[10] The expectation of course was that Moore would foster these relationships in addition to garnering new contacts to promote Episode's services. At best, over the next two weeks, Moore tagged along to meetings Jones scheduled,[11] met with a few surgeons he knew personally and professionally;[12] spoke to three target surgeons at a school event because their daughters were friends;[13] had one meeting with a surgeon with whom he did not have a prior relationship;[14] and, sent out a handful of emails to doctors introducing himself.[15] Far short of any reasonable expectation for the person serving as the face of the company in the New Orleans market; particularly, considering that as Moore puts it "[g]etting the doctor's interest is just step one . . . that can mean absolutely nothing."[16]

In addition to Moore's difficulties meeting the performance expectations of his position, he was also routinely unresponsive to emails from Jones and Vail Willis, Defendants' former COO. These issues culminated in almost an entire workweek with only errant communication from Moore. Starting on Tuesday, September 19, 2017, Moore did not call, text, or email Jones, and her attempts to get in contact with him the following day also went unanswered until Moore called her

---

[9] *Id*. at 75:24 – 76:9; 80:8-11.
[10] *See* September 11, 2017 email from Moore to Willis and Gallagher re: Pipeline/Target Tracker with attachment ("Tracker Email and Pipeline"), a true and correct copy of which is attached hereto as Exhibit E. *See also*, Exhibit B, Moore Dep. at 126:22 – 127:10.
[11] *See* Exhibit E, Tracker Email and Pipeline.
[12] Exhibit B, Moore Dep. at 128:14-20; 129:19 – 131:21; 150:2-10; 179:17 – 180:16. *See also*, *id.* at 132:16 – 133:20.
[13] *Id.* at 166:8-24.
[14] *Id.* at 145:6-18.
[15] *See* Exhibit E, Tracker Email and Pipeline.
[16] Exhibit B, Moore Dep. at 132:8-9, 11-12.

late in the afternoon on Wednesday, September 20, 2017.[17]  Two days later, in an email to Katie Schram, CMS's former Human Resources Consultant, Jones reported that during her Wednesday call with Moore, his speech was slurred and he was incoherent, so she asked him to call her in the morning.[18] The next day, Moore sent Jones a text message at 8:14 a.m. telling her that his daughter was ill and he caught it as well.[19] Moore indicated that he would call Jones later in the day.[20] Moore did not call, text, or send any emails to Jones or anyone else at CMS the remainder of the day, missing scheduled conference calls.[21]

On Friday, September 22, 2017, Jones sent Moore an email laying out the expectation for the New Orleans market and requiring that Moore submit a report each day by 2:30 p.m. and call in each day at 3:00 p.m. to touch base, starting with that very day.[22] The afternoon came and went and Moore had not submitted a report of market updates nor did he otherwise call in to the scheduled meeting at 3:00 p.m., or submit a report of market updates.[23] After Moore missed the required scheduled call, Jones contacted Schram to advise her of the performance and communication issues she and Willis had been experiencing with Moore, requesting guidance on next steps.[24] Hours later, Moore finally responded to Willis' and Jones' string of unanswered emails, apologizing for being out of pocket and explaining that it was due to family issues.[25] Moore gave no indication that these family issues were in fact his relapse.[26]

---

[17] *See* Text Messages between Jones and Moore dated September 18 – 21, 2017 ("Jones Texts"), a true and correct copy of which is attached hereto as Exhibit F. *See also*, Declaration of Adrienne May dated January 1, 2020 ("May Declaration"), ¶ 4 attached hereto as Exhibit G.

[18] Email from Jones to Schram, copying Willis on September 22, 2017, Subject: Employee File and Next Steps ("Next Steps Email"), a true and correct copy of which is attached hereto as Exhibit H. *See also*, Exhibit C, Eadie Decl. ¶ 9.

[19] *See* Exhibit F, Jones Texts.

[20] *Id.*

[21] September 22, 2017 email string between Moore, Willis, and Jones re: NOLA ("NOLA Email"), a true and correct copy of which is attached hereto as Exhibit I. *See also*, Exhibit B, Moore Dep. at 137:1-9.

[22] Email from Jones to Moore on September 22, 2017 re: NOLA ("Daily Calls Email"), a true and correct copy of which is attached hereto as Exhibit J. *See also*, Exhibit C, Eadie Decl. ¶ 10.

[23] Exhibit I, NOLA Email.

[24] *See* Exhibit H, Next Steps Email.

[25] Exhibit I, NOLA Email.

[26] *Id.*; *see also,* Moore Dep. at 140:3 – 17.

On September 23, 2017, Moore sent Jones and Willis a report of market updates for the week.[27] Moore's "updates" were either a continuation of the same status from the week prior or reflected meetings that he and Jones attended together. In other words, his report did not reflect the "lots [of] progress" he contended he was making, a fact that he tacitly conceded in response to Willis' follow-up query as to the particular doctors Moore met with the prior week.[28] At this point, Jones emailed Willis stating that she found Moore's actions over the preceding few days to be "exactly in line with insubordination and should be reflective (sic) in a termination."[29]

Moore then missed a scheduled development conference call with Willis and Episode President and CEO, Tom Gallagher on Monday, September 25, 2017. This spawned a terse email from Willis, who advised Moore that it was "very important that [he] coordinate a call with [Jones] and [him]self" because Willis was "having a hard time understanding the work that was performed last week, combined with [Moore] missing the development call last week with [Jones], plus missing the development call with [Willis] and Tom [that day]."[30] Quite surprisingly, Moore did not respond. Rather, Moore emailed Willis and Jones on Tuesday morning, September 26, 2017, advising them both for the **first time** that he is a recovering alcoholic.[31] In his email, Moore also stated that he relapsed the week prior and was "taking the proper action."[32]  The next day, Moore was admitted for in-patient treatment at the Hazelden Betty Ford Foundation in Newberg Oregon.

---

[27] September 23-24, 2017 email string between Moore and Willis re: Update with attached report ("Updates Report"), a true and correct copy of which is attached hereto as Exhibit K. *See also*, Exhibit B, Moore Dep. at 140:20-25, 141:24 – 143:2.
[28] *See id.*
[29] September 23-24, 2017 email string between Moore, Willis, and Jones re: Update ("Insubordination Email"), a true and correct copy of which is attached hereto as Exhibit L. *See also*, Exhibit C, Eadie Decl. ¶ 11.
[30] September 25, 2017 email from Willis to Moore re: Coordinating a Call ("Coordinating a Call Email"), a true and correct copy of which is attached hereto as Exhibit M. *See also*, Exhibit B, Moore Dep. at 167:17-25.
[31] September 25, 2017 email from Moore to Willis, Jones, and Schram re: Explanation ("Explanation Email"), a true and correct copy of which is attached hereto as Exhibit N. *See also*, Exhibit B, Moore Dep. at 197:23 – 198:18.
[32] *Id.*

On November 1, 2017, Jones met with Moore in person to inform him of CMS's decision to terminate his employment.[33] Willis and Schram attended the meeting via telephone.[34] Jones outlined three issues with Moore's performance that lead to his employment termination: (1) failing to circulate case volume reports, daily log reports, and pipeline development reports timely or at all; (2) not attending scheduled conference calls and missing calls from physicians; and, (3) an unprofessional attitude and demeanor that at times verged on openly hostile.[35]

## II.   PROCEDURAL POSTURE

After going through the EEOC administrative process, Moore filed suit against CMS and Episode on February 20, 2019.[36] In the Complaint, Moore asserted that Defendants had discriminated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., claiming two theories of relief under the ADA. The first is disparate treatment under 42 U.S.C. § 12112(a). For this claim, Moore asserts that Defendants terminated his employment because of his alcoholism, which he alleges "is recognized as a disability under the ADA,"[37] and because he sought treatment for alcoholism.[38] Although not expressly delineated as a separate cause of action in the Complaint, Moore's second claim is failure to accommodate under 42 U.S.C. § 12112(b)(5).

Moore has also recently sought leave to amend the Complaint to include a claim for alleged unpaid wages under the Louisiana Wage Payment Act, La. R.S. 23:631, et seq., which Defendants maintain should be denied as such an addition at this stage in the proceedings will either delay proceedings or prejudice Defendants. Because Moore's suit is currently limited to his claims under

---

[33] Exhibit B, Moore Dep. at 204:2-5.
[34] Id. at 204:13-18.
[35] Termination Follow-Up memorandum authored by Moore ("Termination Follow Up Memo"), a true and correct copy of which is attached hereto as Exhibit O. See also, Exhibit B, Moore Dep. at 204:7-23.
[36] See generally, Complaint (Rec. Doc. 1).
[37] Complaint (Rec. Doc. 1) ¶ 31.
[38] Complaint (Rec. Doc. 1) ¶ 34.

the ADA, Defendants' instant motion does not address the claim for unpaid wages under La. R.S. 23:631 that Moore has sought leave to include.

## III.   LAW AND ARGUMENT

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[39] A genuine dispute over a material fact only arises if the evidence will allow a reasonable jury to a verdict for the non-moving party. Under Rule 56's procedures for supporting factual positions, the party moving for summary judgment bears the initial burden of identifying those materials in the record that it believes demonstrates the absence of a genuinely disputed material fact. Fed. R. Civ. P. 56(c)(1). However, the moving party's initial burden does not require it to negate every element of the nonmoving party's case. Fed. R. Civ. P. 56(c)(1)(B); *see also,* Fed. R. Civ. P. 56 Advisory Committee Notes on 2010 Amendment ("Subdivision (c)(1)(B) recognizes that . . . a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact.").

Once the movant demonstrates the absence of a genuine dispute of material fact for trial, the burden shifts to the nonmoving party to produce evidence of the existence of such a dispute for trial. *See Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015) (citations omitted). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Indeed, to withstand a properly supported motion for summary judgment, the nonmoving party – if it bears the burden of proof at trial – must go

---

[39] Rule 56 was amended in 2010 to change the phrase "issue of material fact" to "dispute of material fact." This change has not impacted the jurisprudential rules concerning summary judgment that were developed prior to the 2010 amendment.

beyond the pleadings and cite particular evidence in the record that supports the essential elements of its claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 – 323 (1986); *accord U.S. ex rel. Patton v. Shaw Servs., LLC*, 418 Fed.Appx. 366, 371 (2011). "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any significant probative evidence to support the complaint.'" *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

Although the Court must resolve factual controversies in favor of the nonmoving party, it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Antoine v. First Student, Inc.,* 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted). Accordingly, courts do not, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Liberty Lobby*, 477 U.S. at 251 – 252).

**B.**   **Moore cannot prove he was treated disparately in relation to his termination from employment with CMS.**

Moore cannot establish a *prima facie* case of disability discrimination under the ADA and cannot show that Defendants' legitimate reasons for terminating his employment are mere pretext for discrimination. Even assuming for purposes of this motion that Moore's alcoholism constituted a disability under the ADA (which Defendants do not admit), Moore has not shown that his alleged disability was the cause for his termination or a motivating factor in Defendants' decision.

        1.        **Moore cannot establish a *prima facie* case of discrimination under the ADA.**

To succeed on his discriminatory termination claim under the ADA, Moore must either present direct evidence that he was discriminated against because of his disability or alternatively use the *McDonnell Douglas* burden-shifting framework. *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Moore has offered only circumstantial evidence to prove his claim; therefore, the *McDonnell Douglas* framework applies. This analysis first requires Moore to establish a *prima facie* case of discrimination under the ADA by showing: (1) he has a disability; (2) he was qualified for the job with Defendants; and, (3) he was subject to an adverse employment decision on account of his disability. *Id.* at 697 (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999). If Moore meets this burden, then Defendants must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 694. Once Defendants provide such a reason, the burden shifts back to Moore, who must

> offer sufficient evidence to create a genuine issue of material fact either (1) that [Defendants'] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [Defendants'] reason, while true, is only one of the reasons for [their] conduct, and another motivating factor is [Moore's] protected characteristic (mixed-motive[s] alternative).

*Id.* at 702 (quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (additional citations omitted). Thus, to ultimately succeed on his ADA discrimination claim, Moore must prove that he was terminated "because of" his alleged disability. 42 U.S.C. § 12112(a).

        a.        **Moore's status as a recovering alcoholic did not substantially limit him in a major life activity when his employment with CMS was terminated.**

Moore's claims fail for the sole reason that he cannot show he suffers from a disability protected under the ADA – an essential element of his discriminatory termination and failure to

accommodate claims for which he bears the burden. *Tyler v. La-Z-Boy Corp.*, 506 Fed.Appx. 265, 267 (5th Cir. 2013). "The finding of a disability is the key that unlocks the storehouse of statutory protections under the [disability laws]." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 249 (6th Cir. 2004) (quoting *Navarro v. Pfizer Corp.*, 261 F.3d 90, 101 (1st Cir. 2001)). While the ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. § 12101 et seq. instruct courts to interpret the statutory definition of "disability" broadly, the ADAAA does not alter this touchstone requirement. Simply put, although the "ADAAA makes it *easier* to prove a disability, it does not *absolve* a party from proving one." *Neely v. PSEG Texas, Ltd. Partnership*, 735 F.3d 242, 245 (5th Cir. 2013) (emphasis in original). To survive summary judgment on this point, Moore must present adequate evidence that he: "(A) [has] a physical or mental impairment that substantially limits one or more of [his] major life activities . . . ; (B) [has] a record of such an impairment; or (C) [was] regarded as having such an impairment." 42 U.S.C. § 12102(1); *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 n.2 (5th Cir. 2016); 29 C.F.R. § 1630.2(g)(2) (describing these as the "actual disability," "record of," and "regarded as" prongs).

Moore does not contend that he has a record of an impairment that substantially limits one or more major life activities, nor does he contend that Defendants regarded him as having such an impairment. Rather, Moore asserts that he satisfies the first "actual disability" prong simply by virtue of being an alcoholic.[40]  Even under the ADAAA's relaxed standards, courts have repeatedly rejected Moore's contention that he is entitled to a presumptive finding that his alcoholism is a *per se* disability under the statute. *See Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011) (explaining that "alcoholism may qualify as a disability *if* it "substantially limits one or more major life activities") (emphasis added and citation omitted); *Burris v. Novaritis Animal Health*

---

[40] *See* Complaint (Rec. Doc. 1), at ¶ 31 (alleging that "[a]lcoholism is a recognized disability under the ADA.").

*U.S., Inc.*, 309 Fed.Appx. 241, 250 (10th Cir. 2009) (unpublished) (recognizing that alcoholism is not a per se disability, but instead "the addiction must substantially limit one or more of the major life activities"; *Oxford House, Inc. v. City of Baton Rouge, La.*, 932 F.Supp.2d 683, 688 (M.D. La. 2013) (concluding that "there is no *per se* rule that categorizes recovering alcoholics . . . as disabled."); *Rodriguez v. Verizon Telecom*, No. 13-6969, 2014 WL 6807834, at *4 (S.D. N.Y. Dec. 2, 2014) ("[a]lcoholism . . . constitute[s] a physical or mental impairment within the meaning of the ADA, but [is] not [a] per se disabilit[y].").

Because alcoholism only constitutes an impairment under the ADA, the court must conduct an individualized assessment to determine whether Moore's status as a recovering alcoholic qualifies as disability. 29 C.F.R. § 1630.2(j)(1)(iv); *Oxford House*, 932 F.Supp.2d at 688. The burden to prove the same remains with Moore, who must present evidence that his alcoholism substantially limits his ability to perform a major life activity, as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii). "Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). There is also a temporal aspect to the actual disability prong that Moore must address to satisfy his *prima facie* burden; he must show that he suffered from a disability at the time of the allegedly discriminatory adverse employment action. *See EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 618 (5th Cir. 2009). In particular, Moore must show that his alcoholism limited a major life activity at the time of his employment termination on November 1, 2017. He cannot do so.

Moore has not identified a single major life activity that was adversely affected by his past alcohol abuse. When asked at his deposition about the impact his alcoholism has on his daily life when he relapses, Moore testified that his alcohol consumption did not limit his ability to work

and earn a living; nor has it prevented him from caring for himself.[41]  Indeed, Moore unequivocally

denied that his alcohol consumption ever interfered with his work for past employers, including

when it progressed into abuse.[42]  Since the first onset of Moore's struggles with alcohol addiction

in 2014,[43] he has held management-level positions with different medical sales companies and

returned to a job in a similar field after his employment with CMS ended.[44]  By his own admission,

Moore's relapses of alcohol abuse did not interfere with any major life activity, including his

ability to work.[45] Accordingly, Moore cannot meet his burden of establishing that his alcohol abuse

amounted to a disability. *See Burch v. Coca-Cola*, 119 F.3d 305, 322 (5th Cir. 1997) (affirming

summary judgment, reasoning that although the plaintiff's alcoholism "assuredly affected how  he

lived and worked far more is required to trigger coverage" and the plaintiff failed to offer any

evidence that his alcoholism substantially impaired his ability to perform major life functions);

*Savoy v. Borden's Milk Prod., LP*, No. 04-1931, 2006 WL 2914647, at *4 (W.D. La. Oct. 10,

2006) (granting summary judgment to employer where plaintiff conceded that "his alcohol use

affected him occasionally in the typical and predictable residual feelings the morning after, but he

never missed work as a result of drinking alcohol, and was able to take care of himself and his

family"); *Lottinger*, 143 F.Supp.2d at 764 (granting summary judgment where plaintiff, a

recovering alcoholic, "manifestly retained the ability to compete successfully with similarly skilled

individuals and no facts indicate[d] that he was unable to perform a class of jobs nor a broad range

of jobs").

Furthermore, the limitations Moore has identified do not qualify as major life activities.

Specifically, Moore testified that "when [he's] drinking," he feels "unmotivated . . . depressed, . .

---

[41] Exhibit B, Moore Dep. at 20:18-20, 24-25; 21:1; 24:22 – 25:2.
[42] *Id*. at 25:19-24.
[43] *Id*. at 21:13-15.
[44] *Id.* at 24:14 – 25:24; 50:1-3; 51:19 – 52:23.
[45] *Id.* at 24:14 – 25:24.

. shameful and guilty and unproductive."[46] Such emotional states are not major life activities under

the ADA. *See e.g., Smoke v. Wal–Mart Stores, Inc.,* 208 F.3d 227, 2000 WL 192806, *3 (10th Cir.

Feb. 17, 2000) (explaining that an ability to cope with anxiety and depression "may be a necessary

component of many major life activities, but it is not itself an activity.'"). Even if feelings of apathy

and embarrassment were major life activities, Moore did not describe his limitations as being any

more substantial than the average person, and are in fact notably less impactful than limitations of

recovering alcoholics courts have found sufficient to establish a disability. *See Oxford House, Inc.*,

932 F.Supp.2d at 680 (recovering alcoholic's testimony that she would "be on the street" and "then

back in jail" if she became active in her addiction found to be sufficient to establish disability

under the ADA, as amended).

      Moore's own pleadings and testimony confirm that he was not suffering an ADA disability

when his employment with CMS ended. In the Complaint, Moore asserts he was "sober and in

recovery for years prior to his employment with Defendants" and "able to come back to work" as

of October 27, 2017 – days before he was terminated.[47] In addition, Moore testified at his

deposition that he could go "months and months without drinking,"[48] and considered the treatment

he received in October of 2017 as successful.[49] Although Moore has also testified to having

undergone treatment for alcohol abuse since 2014,[50] occasional treatments and past

hospitalizations are not proof that an individual's alcoholism constitutes a disability under the

ADA. *See, e.g., Zenor v. El Paso Healthcare Sys., Ltd*, 176 F.3d 847, 860 (5th Cir. 1999)

(explaining that even prior hospitalizations for alcoholism do not necessarily mean that the

employee's alcoholism rises to the level of a disability absent evidence that the alcoholism limited

---

[46] *Id*. at 20:13-17.
[47] Complaint (Rec. Doc. 1), at ¶¶ 14 and 21.
[48] Exhibit B, Moore Dep. at 39:12.
[49] *Id.* at 199:15-19.
[50] *Id.* at 28:5-13; 29:20 – 30:21; 36:1-15.

a major life activity); *Kitchen v. BASF*, 343 F.Supp.3d 681, 690 (S.D. Tex. 2018) (same). Moore has not presented any evidence showing that as of November 1, 2017 his alcoholism substantially impaired his major life activities. Therefore, he cannot establish that he was disabled under the ADA as required for the first element of his *prima facie* case.

> **b.     Moore cannot show that his employment with CMS was terminated on account of his alcoholism.**

Even if Moore could sustain his summary-judgment burden to establish that he is disabled within the meaning of the ADA, he cannot prove the last element of his *prima facie* case – that he "was subject to an adverse employment decision on account of [his alcoholism]." *See LHC Group, Inc.*, 773 F.3d at 700 (quoting *Zenor*, 176 F.3d at 853). It is undisputed that Moore suffered an adverse employment action in the form of his termination. His broad assertion that CMS terminated his employment because of his alcoholism [51] is predicated on pure speculation, a mischaracterization of the operable evidence, and his clouding of the documented issues his supervisors raised as to his performance. Specifically, Moore contends that Jones and Willis did not criticize his performance until after he disclosed his alcoholism and recent relapse, and that these criticisms were exaggerated or fabricated.[52] The record does not support Moore's speculations that the timing of his disclosure, leave to seek treatment, and his supervisors' voiced dissatisfaction with his performance show a nexus between his alcoholism and employment termination. In fact, the record sets forth an entirely different chronology of events.

The undisputed evidence clearly establishes that Moore's unknown whereabouts and work status between September 19-22, 2017 precipitated the discussions about Moore's continued employment with CMS.[53] The scant progress reflected in the belated market report Moore sent

---

[51] *See* Complaint, ¶¶ 26 and 35; *see also*, Exhibit O, Termination Follow Up Memo (stating that "it is clear to me that I have been terminated due to my personal medical situation.").
[52] Exhibit B, Moore Dep. at 205:8 -206:14.
[53] Exhibit L, Insubordination Email.

Willis and Jones on September 23, 2017 only heightened Defendants' growing doubts as to whether Moore could balance the pace and complexities of Episode's business with the urgency for volume in physician development to generate the results Episode sought in the New Orleans market.[54] In not so many words, Moore acknowledged his nominal effort in securing meetings with physicians, stating that the prior week "presented a challenge" for him.[55] When Moore missed another development call with Willis and Gallagher on September 25, 2017, Willis again communicated his significant concerns over Moore's demonstrated performance deficiencies.[56] The substance of Willis' email went entirely unanswered.[57]

Fatal to Moore's ability to demonstrate or raise a dispute of fact as to a nexus between Moore's ultimate employment termination and his alleged disability is the undisputed fact that Moore had neither disclosed his alcoholism and recent relapse, nor advised that he would be checking into a one-month alcohol abuse treatment program until September 26, 2017.[58] As such, the individuals who made the decision to terminate Moore's employment were wholly unaware he was a recovering alcoholic and had relapsed when, for example, Jones told Willis that she found Moore's actions "exactly in line with insubordination and show be reflective in a termination."[59] Simple logic dictates that absent knowledge of Moore's alcoholism, Moore could not have been terminated on account of his alleged disability. Thus, Moore has not met his burden of showing a causal link between his alleged disability and his employment termination and, in turn, cannot prove the last element of his *prima facie* case.

>   **2.     Defendants had a legitimate, non-discriminatory reason for terminating Moore's employment.**

---

[54] *Id.*; *see also*, Exhibit K, Updates Report; Exhibit M, Coordinating a Call Email.
[55] Exhibit K, Updates Report.
[56] Exhibit M, Coordinating a Call Email.
[57] Exhibit B, Moore Dep. at 167:20 – 170:2.
[58] Exhibit B, Moore Dep. at 197:23 – 198:25; *see also,* Exhibit N, Explanation Email.
[59] Exhibit L, Insubordination Email.

Assuming *arguendo* that Moore can establish a *prima facie* case or offer evidence raising a genuine dispute as to any of the three required elements – neither of which he can do – Defendants had a legitimate, non-discriminatory reason for terminating Moore's employment: his poor work performance, which was evident on a variety of fronts. The record makes clear that Moore's supervisors identified a number of performance issues within the brief three-week period Moore was on the job,[60] and that Defendants terminated Moore's employment because of his utter dereliction of his job duties.[61] "Terminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate and nondiscriminatory as a matter of law." *LHC Group*, 773 F.3d at 701-702 (citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 – 373 (5th Cir. 1997) and *Smith v. Rockwell Int'l Corp.*, 77 F.3d 473 (5th Cir. 1995) (unpublished)). Furthermore, Defendants shared Moore's three most recurring performance issues with him during the termination meeting on November 1, 2017.[62] *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015) (holding that a charge of "poor work performance" is adequate when coupled with specific examples).

### 3.     There is no evidence of pretext or that Moore's alcoholism motivated Defendants' decision to terminate his employment with CMS.

Should the Court reach the final stage of the *McDonnell-Douglas* analysis, Moore must next offer sufficient evidence that creates a factual dispute as to Defendants' legitimate, non-discriminatory reasons for terminating his employment with CMS. *Delaval*, 824 F.3d at 479. Specifically, Moore must show there is a factual dispute that: (1) Defendants' reason is not true but pretext for discrimination; or (2) that Defendants' reason, while true, is only one of the reasons

---

[60] *See* Exhibit K, Updates Report; Exhibit L, Insubordination Email; and, Exhibit M, Coordinating a Call Email.
[61] *Id.*; *see also*, Personnel Action Form for Justin Moore, dated November 1, 2017, a true and correct copy of which is attached hereto as Exhibit P. *See also*, Eadie Del. at ¶ 12.
[62] Exhibit B, Moore Dep. at 204:19-23.

for the adverse employment action, and Moore's alleged disability was another motivating factor.[63]
*Id.* at 479-480. Moore cannot satisfy either alternative.

In response to a motion for summary judgment, an employee must present "substantial evidence that the employer's legitimate, non-discriminatory reason for termination is pretextual." *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 480 (5th Cir. 2016) (citing *Burton*, 798 at 233). An employee can establish pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citations and internal quotation marks omitted). Here, there is no evidence that Jones, Willis, or Schram expressed any animus toward disabled persons or alcoholics.[64] Nor is there any factual evidence that any non-disabled employee was ever allowed to remain employed under nearly identical circumstances.[65]

With respect to the second option of the pretext alternative, Moore must show that Defendants' proffered reason was false <u>and</u> offer evidence that "discrimination lay at the heart of the employer's decision." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). Pretext can be proved by "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

---

[63] Whether the mixed motive test is the proper causation standard in ADA discrimination claims remains an open question following the United States Supreme Court's ruling in *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009) (holding that the "because of" language in the Age Discrimination in Employment Act requires application of the more strenuous "but-for" causation standard). Historically, the Fifth Circuit construed the parallel "because of" language in the ADA as allowing a motivating-factor test; however, several other circuits in the post-*Gross* era have rejected the mixed-motives standard and applied "but-for" causation to ADA claims. *See, e.g., Murray v. Mayo Clinic*, 934 F.3d 1101 (9th Cir. 2019); *Natofsky v. City of New York*, 921 F.3d 337 (2d Cir. 2019); *Lewis v. Humboldt*, 681 F.3d 312 (6th Cir. 2012); *Palmquist v. Shinseki*, 689 F.3d 66 (1st Cir. 2012); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957 (7th Cir. 2010). The Fifth Circuit has not directly addressed whether the mixed-motive option remains available, and its decisions post-*Gross* fail to provide a clear answer. For example, in *Feist v. Louisiana Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013) the Fifth Circuit examined an ADA retaliation claim under the but-for causation standard, but held in *LHC Group*, 773 F.3d at 702-703, that the plaintiff could either the pretext or mixed-motive options to prove causation in an ADA discrimination case. Because the proper causation standard for an ADA claim appears to be in flux, *See Clark v. Boyd Tunica, Inc.*, 665 F. App'x 367, 371 n.4 (5th Cir. 2016) (declining to decide whether mixed-motives alternative survived Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)), Defendants have examined Moore's claim under both the pretext and mixed-motive options.
[64] Exhibit B, Moore Dep. at 226:6-12.
[65] *Id.* at 226:23 – 227:5.

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reason." *Martin v. St. Luke's Episcopal Hosp.*, No. 13-0718, 2014 WL 4810303, at *10 (S.D. Tex. Sept. 13, 2014) (internal quotation marks and citations omitted). However, "mere conjecture that the employer's reason is pretext is an insufficient basis for the denial of summary judgment." *Id.* (citing *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 336 (5th Cir. 1997)). In this case, the record is devoid of any evidence that would enable Moore to satisfy his burden to demonstrate pretext.

First, Moore cannot show that Defendants' proffered reasons were false. He does not dispute that he missed meetings and scheduled calls or that his supervisors conveyed concerns regarding Moore's scant work production and lack of communication.[66] Moore's disagreement with his former supervisors' assessment of his performance[67] is insufficient to establish pretext as a matter of law. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) ("Merely disputing [the employer's] assessment of [the employee's] performance will not create an issue of fact [as to pretext]."). It is simply immaterial whether Defendants' evaluation of Moore's job performance was accurate or not. *See Little v. Republic Ref. Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991) ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination.). Stated otherwise, "[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir.1995). Accordingly, Moore is required to show not only that Defendants' determination as to his poor performance was

---

[66] *Id.* at 147:17 – 148:6.
[67] *Id.* at 168:18 – 169:3.

wrong, but also that it was reached in bad faith. *See Thomas v.* Johnson, 788 F.3d 177, 179 (5th Cir. 2015). He cannot do so.

This absence of any evidence that Defendants' decision to terminate Moore's employment – regardless of whether that decision was correct – was motivated by any discriminatory animus also forecloses Moore's ability rely upon the timing of his termination to establish pretext. As Moore explained at his deposition, his contention that Defendants terminated his employment because of his alcoholism and attendance at an alcohol rehabilitation program stems from the fact that he was terminated shortly after returning from treatment.[68] Essentially, Moore maintains that the timing of his employment termination is suspicious.[69] However, "[t]iming standing alone is not sufficient absence other evidence of pretext." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015). Other than his subjective belief that he was the target of discriminatory animus,[70] Moore has no evidence that his performance issues were a pretext for disability discrimination. As a result, Moore cannot raise an inference of pretext based on the close temporal proximity of his employment termination to Defendants' initial notice that he suffered from alcoholism and recently relapsed. On this record, Moore's claim fails and summary judgment is proper.

Because Moore cannot demonstrate pretext, he must offer evidence of a material factual dispute under the motivating-factor analysis to survive summary judgment. In this regard, Moore must show that Defendants' decision to terminate his employment was based on a mixture of their legitimate, non-discriminatory reasons and "discrimination . . . [so long as it] actually play[ed] a role in [Defendants'] decision making process and ha[d] a determinative influence on the outcome." *Delaval*, 824 F.3d at 479-480 (citations omitted). Moore cannot overcome Defendants'

---

[68] *Id.* at 205:8 – 206:14.
[69] *Id.* at 206:9-14.
[70] *Id.* at 205:8-23

21

proffered legitimate, non-discriminatory reasons via the more lenient mixed-motive alternative. Discussions between Willis and Jones about Moore's lack of accountability and failure to personally generate activity in his market were already underway before Moore disclosed his alcohol abuse and relapse.[71] Much like Moore's inability to meet his *prima facie* burden to show that he was terminated on account of his alleged disability, Defendants' lack of knowledge that Moore is a recovering alcoholic precludes any finding that his alcoholism was a motivating factor in Defendants' ultimate decision to terminate his employment. Even if Moore could point to evidence that his disability was a motivating factor in his termination, his claim will still fail because Defendants can show that they would have made the same decision absent any discriminatory animus. *See Radick v. Union Pac. Corp.*, No. 14-2075, 2016 WL 639126, at *4 (S.D. Tex. Jan. 25, 2016).

### C.     Moore does not have a cognizable failure-to-accommodate claim.

To state an ADA failure-to-accommodate claim, Moore must prove (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the Defendants; and (3) Defendants failed to make reasonable accommodations for such known limitations." *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013) (citations omitted). "[W]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Griffin*, 661 F.3d at 224 (quoting *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009)). To satisfy the employee's burden to suggest a reasonable accommodation, the accommodation request must be prospective - meaning in the case

---

[71] *See* Exhibit L, Insubordination Email.

of a termination decision, the employee must request an accommodation **before** the conduct causing the employment termination. *Burch*, 119 F.3d at 320, n. 14 ("a second chance or a plea for grace is not an accommodation as contemplated by the ADA."). Moore's accommodation claim fails the facial reasonableness standard because he did not request an accommodation until after his supervisors conveyed their serious doubts as to his ability to meet the expectations of the job, *i.e.*, his termination was imminent.

### 1.    Moore did not request a reasonable accommodation.

Moore does not allege that he requested a particular accommodation, which Defendants declined to grant; rather, he asserts Defendants "made no individualized assessment to determine whether [he] could perform the essential functions of his job or whether a reasonable accommodation would enable him to be employed in his position, as required under the ADA."[72] During his deposition, Moore elaborated as to the basis of his failure-to-accommodate claim, leaning on his exchange with Schram.[73]  That conversation, Moore asserts, shows that he requested – and was granted – an accommodation in the form of a job-protected leave of absence to treat his recent relapse.[74] As Defendants appreciate his claim, Moore contends that terminating his employment constituted a withdrawal of that accommodation in violation of the ADA.

Time off, whether paid or unpaid, can be a reasonable accommodation if the leave is not indefinite. *Delaval*, 824 F.3d at 481. Notwithstanding the fact that Moore did not ask for permission to take a medical leave of absence,[75] his purported accommodation request was not reasonable because it came after the proverbial writing was on the wall; his supervisors had already raised significant concerns about his work performance in just a few weeks of his employment.[76]

---

[72] Complaint (Rec. Doc. 1) ¶ 35.
[73] Exhibit B, Moore Dep. at 62:4-25.
[74] *Id.* at 201:24 – 202:22.
[75] *See* Exhibit N, Explanation Email (stating that he was "taking proper action.").
[76] *See* Exhibit K, Updates Report; Exhibit L, Insubordination Email; and, Exhibit M, Coordinating a Call Email.

This conclusion is consistent with persuasive authority from multiple federal appellate courts and EEOC guidance. *Burch*, 119 F.3d at 320, n. 14; *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 906 (8th Cir. 2015) (affirming summary judgment in favor of the employer holding that liability is not established where "an employee engages in misconduct, learns of an impending adverse employment action, and then informs his employer of a disability that is the supposed cause of the prior misconduct and requests an accommodation."); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 85-90 (1st Cir. 2012) (affirming dismissal of failure to accommodate claim on grounds that accommodation requested was not reasonable explaining that "[w]hen an employee requests an accommodation for the first time only after it becomes clear than an adverse employment action is imminent, such a request can be 'too little, too late.'"); *McElwee v. Cnty. of Orange*, 700 F.3d 635 (2d Cir. 2012) (concluding that a "requested accommodation that simply excuses past misconduct is unreasonable as a matter of law,"); EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA, ¶ 36 ("Since reasonable accommodation is ***always prospective***, an employer is not required to excuse past misconduct even if it is the result of the individual's disability.").

In other words, terminating Moore's employment upon his return did not constitute a withdrawal of a reasonable accommodation in violation of the ADA; there was no reasonable accommodation for Defendants to withdraw. Because Moore did not request a reasonable accommodation, he cannot sustain his failure-to-accommodate claim as a matter of law.

### 2. Whether Defendants initiated the interactive process is immaterial to Moore's failure-to-accommodate claim.

As established by case law and the undisputed facts, Moore has not identified an essential element of his failure-to-accommodate claim – a reasonable accommodation. In circumstances where an employee fails to identify a reasonable accommodation, it is immaterial whether the

employer engaged in the interactive process. *See, e.g., Silva v. City of Hidalgo, Tex.*, 575 Fed.Appx 419, 424 (5th Cir. 2014) ("[E]ven if a genuine issue of material fact exists as to whether the City participated in the interactive process in good faith, its dereliction cannot be said to have *led to* a failure to reasonably accommodate [employee] because there is no evidence that a reasonable accommodation was feasible. For this reason, [employee] has not put forth evidence sufficient to prevail on her ADA claim.")

That CMS did not actually process Moore's employment termination or advise him of their decision and the corresponding legitimate non-discriminatory reasons until November 1, 2017 did not obligate it to engage in the interactive process instead of terminating Moore. When presented with similar circumstances, courts within this Circuit have explained that they "must not permit the employee to use the ADA as a shield from being fired by suddenly requesting an accommodation before the ink on [the employee's] valid termination papers is dry." *Green v. Medco Health Solutions of Texas, LLC*, 947 F.Supp.2d 712, 729 (N.D. Tex.2013); *see also*, *Kent v. Roman Catholic Church*, No. 96-1505, 1997 WL 30201, at *2 (E.D. La. Jan. 22, 1997) ("The ADA does not . . . create an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions vis-à-vis the employee."). Moore's accommodation request was both unreasonable and untimely because his termination had already been set in motion when he informed Defendants that he would be taking a leave of absence. Thus, Defendants were under no obligation to engage in the interactive process pursuant to the ADA.

IV.    **CONCLUSION**

The undisputed facts in the record establish that Moore cannot offer sufficient evidence to create a material factual dispute regarding his disparate treatment and failure-to-accommodate claims under the ADA. These uncontroverted facts entitle Defendants to judgment as a matter of law and require dismissal of Moore's present lawsuit.

Respectfully submitted,

**ADAMS AND REESE, LLP**

*/s/   Adrienne C. May*
LAUREN T. TAFARO (#29320)
ADRIENNE C. MAY (#35037)
701 Poydras Street, Suite 4500
New Orleans, LA   70139
Telephone:  (504) 581-3234
Facsimile: (504) 566-0210
Email: lauren.tafaro@arlaw.com
Email: adrienne.may@arlaw.com

*Attorneys for Defendants*

26